## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ADVISORS EXCEL, LLC,

       Plaintiff,

v.

ZAGULA KAYE CONSULTING, LLC
and MATTHEW ZAGULA,

       Defendants.

Case No. 15-4010-DDC-KGS

## MEMORANDUM AND ORDER

This matter comes before the Court on plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 4). On January 27 and 30, 2015, the Court conducted a hearing on plaintiff's motion for temporary restraining order, and based on the findings and conclusions set forth by the Court on the record of the hearing on January 30, 2015, the Court entered an Order granting in part and denying in part plaintiff's request for a temporary restraining order (Doc. 22). Under Fed. R. Civ. P. 65, the Court restrained and enjoined defendant Zagula Kaye Consulting, LLC from:

> directly or indirectly contacting, soliciting, or recruiting any licensed insurance producer with the purpose or effect of inducing such licensed insurance producer to leave the Advisors Excel, LLC distribution hierarchy with any carrier.

(Doc. 22 at 1) The Order was to remain in effect for 14 days from the day it was entered (until February 14, 2015), or until modified by subsequent order. On February 13, 2015, the Court extended the temporary restraining order by an additional 14 days, or until February 28, 2015, or other order of this Court (Doc. 48). *See* Fed. R. Civ. P. 65(b)(2).

On February 12, 2015, the Court conducted a hearing on the portion of plaintiff's motion seeking a preliminary injunction. The Court is prepared now to rule on that issue. In reaching its

1

decision, the Court has considered the evidence presented by the parties at the January 27 and 30, 2015 hearings on plaintiff's motion for a temporary restraining order, the evidence that the parties filed with the Court before the preliminary injunction hearing,[1] and the evidence presented by the parties at the preliminary injunction hearing on February 12, 2015.  After considering the evidence, submissions, and the parties' arguments, the Court grants plaintiff's motion for preliminary injunction, as specified at the end of this order.

## I.       Factual Background

Plaintiff is a national independent marketing organization engaged in the business of marketing insurance products and services to licensed insurance producers and connecting those producers to insurance companies.  Defendant Zagula Kaye Consulting, LLC ("ZK") is a licensed insurance and financial services producer that provides sales and marketing systems for other insurance producers and financial professionals.  Defendant Matthew Zagula is a principal of ZK.

On May 1, 2012, plaintiff and ZK entered into a First Amended and Restated Purchase, Consultation and Commission Agreement ("Agreement").  Zagula signed the Agreement on ZK's behalf.  Under the terms of the Agreement, ZK agreed to transfer all right, title, and interest in the "Centurion Coaching" training program to plaintiff.  As consideration for this transfer of intellectual property, plaintiff agreed to pay ZK a onetime purchase price of $560,000.  Under the Agreement, ZK also agreed to provide training services, to recruit producers to affiliate with plaintiff, and to place its personal production exclusively through plaintiff.  As consideration for these services, plaintiff agreed to pay ZK override compensation for production by producers

---

[1]       This evidence includes the documents filed electronically by the parties on the Court's CM/ECF system:  the Affidavit of Jolene Gochenour (Doc. 37), Plaintiff's Designation of Testimony of Matthew Zagula (Doc. 38), the Affidavit of David Byers (Doc. 39), and Defendants' Designation of Testimony for Hearing (Doc. 43).

who ZK recruited to join plaintiff after the date of the Agreement and to compensate ZK at its current compensation level for personal production of insurance products placed through plaintiff.

The Agreement specified a term of 30 months beginning on May 1, 2012, and continuing until November 30, 2014, when the Agreement would renew automatically for successive two-year terms unless either party terminated the Agreement in the manner it specified.

The Agreement also contained a non-solicitation clause.  It provided:

> For a period beginning on the effective date of this Agreement and continuing for thirty (30) months after [plaintiff's] final payment to ZK arising out of this Agreement, ZK agrees not to directly or indirectly contact, solicit, or recruit any producer with the purpose or effect of inducing such producer to leave the [plaintiff's] distribution hierarchy with any carrier.

Agreement at § 13(a) (Doc. 1-1 at 5).  In the context of plaintiff's business model and the market it strives to serve, the term "producer" describes a group of individuals who are plaintiff's customers.  The parties also agreed that any breach of the non-solicitation clause would cause plaintiff irreparable harm.  *Id.* at § 13(b) (Doc. 1-1 at 5).  Finally, the Agreement requires ZK to pay plaintiff "liquidated damages in an amount equal to all gross commission and override[2] received by [plaintiff] for the sale of insurance products in the previous twelve (12) months from the date of release for any and each agent who seeks and obtains a release from the [plaintiff's] Hierarchy with any carrier either directly or indirectly as a result of contact with ZK." *Id.*

On June 5, 2014, Mr. Zagula, on ZK's behalf, sent plaintiff a letter terminating the Agreement upon its expiration on November 30, 2014.  Plaintiff asserts that ZK is violating the Agreement's non-solicitation clause because it has contacted plaintiff's producers and invited them to attend an event in San Diego, California, with the purpose of recruiting them to affiliate

[2]     Based on the evidence presented at the hearing, the Court understands this term to mean override commission payments.  However, the quoted language above is faithful to the words actually used in the Agreement.

themselves with a competing marketing organization that defendants are in the process of creating.  Plaintiff has filed a Motion for Preliminary Injunction asking that the Court enjoin defendants from improperly soliciting plaintiff's producers in violation of the Agreement.

## II.      Legal Standard

The limited purpose of a preliminary injunction under Fed. R. Civ. P. 65 is "merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  To prevail on a motion for preliminary injunction, the movant must prove that all four of the following equitable factors weigh in its favor:  (1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction, if issued, will not be adverse to the public interest.  *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007) (citation omitted).

Whether to grant a preliminary injunction rests within the Court's sound discretion.  *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (citations omitted).  A preliminary injunction is an extraordinary remedy, so the right to relief must be "clear and unequivocal."  *Id.*  "In general, 'a preliminary injunction . . . is the exception rather than the rule.'"  *Gen. Motors Corp.*, 500 F.3d at 1226 (quoting *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984)).

## III.     Analysis

### A.  Irreparable Harm

The Court first examines whether the plaintiff has shown irreparable harm.  "[C]ourts have consistently noted that '[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first

demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'" *Dominion Video Satellite v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260–61 (10th Cir. 2004) (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)).

Irreparable harm "'does not readily lend itself to definition.'" *Id.* at 1262 (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)). And proving irreparable harm is not "'an easy burden to fulfill.'" *Id.* (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)). "To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "Irreparable harm is not harm that is merely serious or substantial." *Id.* (citations and internal quotation marks omitted).

A plaintiff establishes irreparable harm by demonstrating "'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone*, 321 F.3d at 1258). A claim of "purely speculative" harm does not suffice; instead, a plaintiff must show that "significant risk of irreparable harm" is present to meet the burden. *Id.* (quoting *Greater Yellowstone*, 321 F.3d at 1260)). Moreover, wholly conclusory statements do not amount to irreparable harm. *Dominion Video*, 356 F.3d at 1261. The Court must determine if the harm is likely to take place before a ruling on the merits. *RoDa Drilling Co.*, 552 F.3d at 1210 (quoting *Greater Yellowstone*, 321 F.3d at 1260)).

A plaintiff may establish irreparable harm by "such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill

or competitive market position." *Dominion Video*, 256 F.3d at 1264; *see also Hill's Pet Nutrition, Inc. v. Nutro Prod., Inc.*, 258 F. Supp. 2d 1197, 1205 (D. Kan. 2003) ("[L]oss of customers, loss of goodwill, and threats to a business' viability can constitute irreparable harm." (citations and internal quotation marks omitted)).

As the Tenth Circuit noted in *Dominion Video*, the question whether plaintiff has shown irreparable harm often is a "difficult and close" one. *Dominion Video*, 356 F.3d at 1262. This case proves that point. The Circuit has set a high bar for proving irreparable harm, but based on the facts and circumstances presented here, the Court concludes that plaintiff has shown sufficient evidence to satisfy the irreparable harm standard and thus plaintiff deserves injunctive relief.

Here, plaintiff has demonstrated irreparable harm from ZK's plan to raid plaintiff's producers. Mr. Zagula has conceded that he invited some of plaintiff's producers to attend an event in San Diego so he could introduce his business partner and, ultimately, recruit them to a new competing business. Plaintiff also presented evidence that Mr. Zagula solicited its producers during a "Producer's Club" conference call. Specifically, one of plaintiff's producers, Stephanie Fullerton, contacted plaintiff about Mr. Zagula's call because she was confused about Mr. Zagula's current relationship with plaintiff. She described Mr. Zagula's representations during this conference call, saying that Mr. Zagula had informed the group that he was starting his own business and that he would be presenting the producers with an opportunity to join another marketing group. Although none of plaintiff's producers has left plaintiff so far, the Court finds that defendants' recruitment efforts, if left unchecked, are likely to result in a loss of producers and harm to plaintiff's goodwill. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (a plaintiff must demonstrate that irreparable injury is *likely* in the absence of

an injunction) (citation omitted)); *see also Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F. Supp. 2d 1102, 1108 (D. Kan. 2000) (plaintiff showed irreparable harm where defendant's behavior was likely to result in a loss of customers as well as customer goodwill); *Zurn Constructors, Inc. v. B.F. Goodrich Co.*, 685 F. Supp. 1172, 1181 (D. Kan. 1998) (plaintiff demonstrated irreparable harm by, among other things, showing that it was threatened with a loss of goodwill and eventual loss of customers).

Plaintiff also has shown irreparable harm by a loss of competitive market position. *See Dominion Video*, 256 F.3d at 1264. Plaintiff asserts that defendants' efforts to recruit its producers make it look weak in its competitive marketplace. Plaintiff also cites examples in its industry where the successful recruitment of one producer has "snowballed," causing other producers to follow suit. While no "snowball" has formed here, plaintiff has demonstrated that this threat is a real one, and not just a theoretical or speculative possibility. *See Heideman*, 348 F.3d at 1189 (injury must be certain, great, actual and not theoretical to constitute irreparable harm); *see also Prairie Band of Potawatomi Indians*, 253 F.3d at 1250 (threat that the state would continue to cite the tribe for violation of motor vehicle registration and titling laws was certain and great without a preliminary injunction). This type of harm to plaintiff's competitive position in the marketplace demonstrates irreparable harm. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (loss of competitive injuries and loss of goodwill are difficult to quantify and thus may constitute irreparable injury).

Also, as the Second Circuit has recognized, a distributor of a unique product may establish irreparable harm where the product's manufacturer refuses to supply the product through the distributor. *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907–08 (2d Cir. 1990). In such circumstances, irreparable harm may be "particularly evident when many of the

distributor's customers have indicated . . . a strong preference for the terminated product." *Id.* at 908.  While this case does not involve a distributor/manufacturer relationship, the evidence shows that Mr. Zagula occupies a unique market position.  He offers a marketing program that is attractive to top performing producers.  Recognizing this appeal, plaintiff contracted with Mr. Zagula to provide his training program to its top performing producers, and through that program, plaintiff introduced Mr. Zagula to these high performing individuals.  Plaintiff gave Mr. Zagula "stage time" at several of these events and he provided training to these producers. Plaintiff also funded social activities around these events and invited Mr. Zagula to interact with its producers during them.  This gave him opportunities to form relationships with them.  The evidence shows Mr. Zagula maintained his contacts with these high performing individuals and that he has reached out to them to invite them to the San Diego event, where, he concedes, he intended to recruit them to a competing business.  This risk is precisely the kind of harm that plaintiff bargained to avoid when it asked ZK (and Mr. Zagula, as its agent) to promise that it would not solicit plaintiff's producers.  Plaintiff will suffer irreparable harm if Mr. Zagula is not prohibited from soliciting these high performing producers, some of whom have indicated a preference for Mr. Zagula's training program.

ZK's post-termination conduct exposes plaintiff to another form of irreparable harm, *i.e.*, "a significant risk that [plaintiff] will experience harm that cannot be compensated after the fact by monetary damages.'"  *RoDa Drilling Co.*, 552 F.3d at 1210 (quoting *Greater Yellowstone*, 321 F.3d at 1258).  It is true:  the Agreement contains a liquidated damages provision obligating ZK to pay plaintiff the amount that plaintiff received in commissions for the previous year for any agent who leaves plaintiff's hierarchy either directly or indirectly as a result of contact with ZK.  Agreement at § 13(b) (Doc. 1-1 at 5).  But this liquidated damages provision does not

preclude a finding of irreparable harm.  Where, as here, plaintiff has demonstrated irreparable harm in the form of intangible harms such as the loss of goodwill and damage to reputation, those damages are difficult to measure in a monetary amount.  *See Bad Ass Coffee Co. of Hawaii, Inc. v. JH Nterprises, L.L.C.*, 636 F. Supp. 2d 1237, 1250 (D. Utah 2009); *see also Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) (irreparable harm shown where damages from breach of non-compete agreement are difficult to calculate precisely).  Here, plaintiff has shown that it has invested significant goodwill and training in its producers and it risks losing them if ZK solicits them, directly or indirectly, to move their business to a competing enterprise.  These forms of damages are difficult to calculate and thus constitute irreparable harm.  *See Bad Ass Coffee Co.*, 636 F. Supp. 2d at 1250.

Moreover, the Agreement here does not prohibit ZK from competing against plaintiff; it only prohibits ZK from soliciting plaintiff's producers.  The evidence enables the Court to foresee a likely scenario where a producer leaves plaintiff's hierarchy, but the available facts do not establish whether the producer left plaintiff's hierarchy because of ZK's subtle solicitation or simply based on the producer's own decision to move to a competing enterprise.  In that situation, the Court concludes that it will be impossible to calculate the damage plaintiff sustained by that lost producer.  *See Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1498 (10th Cir. 1993), *overruled on other grounds by TW Telecom Holdings, Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011) (evidence that plaintiff had "no way of ascertaining how may customers were lost" was evidence of irreparable harm).  Thus, the Agreement's adoption of the liquidated damages clause does not nullify irreparable harm here.

Finally, the Court notes that the Agreement contains a provision stating that a breach of the non-solicitation clause will cause plaintiff irreparable harm is not sufficient alone to satisfy

this factor of the preliminary injunction standard.  Agreement at § 13(b) (Doc. 1-1 at 5).  The Tenth Circuit has recognized that "[w]hile courts have given weight to parties' contractual statements regarding the nature of harm and attendant remedies that will arise as a result of a breach of a contract, they nonetheless characteristically hold that such statements alone are insufficient to support a finding of irreparable harm and an award of injunctive relief." *Dominion Video*, 356 F.3d at 1266.  Here, though, plaintiff does not rely on this agreement alone to establish irreparable harm.  Instead, as shown above, plaintiff has demonstrated that failing to enforce the non-solicitation clause will cause irreparable harm to plaintiff.

Defendants urge the Court to follow the Tenth Circuit's reasoning in *Dominion Video*, where the Circuit reversed a district court's entry of a preliminary injunction because plaintiff had not established irreparable harm.  In that case, the district court rejected plaintiff's arguments of irreparable harm, but concluded that the defendant's breach of an agreement's exclusivity provision, itself, created irreparable harm.  356 F.3d at 1261–62.  The Tenth Circuit disagreed, holding that the breach of an exclusivity provision alone will not supply the irreparable harm required by our preliminary injunction test.  *Id.* at 1262.  Rather, a plaintiff must demonstrate irreparable harm in the form of other factors like the ones discussed above—the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position.  *Id.* at 1264.  In *Dominion Video*, the district court rejected plaintiff's assertions that its business' existence was threatened, it was losing customers or its competitive position in the marketplace, it was close to business failure, it had suffered harm to good will, and damages would be difficult to quantify.  *Id.*  Thus, the district court "rejected virtually all of the factors courts normally rely upon to support a finding of irreparable

harm," and erred by basing its finding of irreparable harm based solely on defendant's breach of the exclusivity agreement.  *Id.*

In contrast, here, plaintiff has shown it will suffer a variety of irreparable harms if the Court denies injunctive relief.  The Court's conclusion that plaintiff has demonstrated irreparable harm is not based solely on ZK's admitted breach of the non-solicitation clause.  Rather, plaintiff has shown irreparable harm in the form of loss of goodwill, loss of competitive market position, and the difficulty in calculating damages.  Thus, the facts here differ from the findings that the Circuit considered in *Dominion Video*.

The Court is mindful that the facts in this case present circumstances that are nearly unique.  To his credit, Mr. Zagula was candid during his testimony at the January 30, 2015 hearing.  He readily admitted that he had solicited plaintiff's producers and planned to continue doing so.  But in his judgment, this did not violate the Agreement's non-solicitation clause because, as he explained, he had engaged in these acts on the belief that the non-solicitation clause was no longer in effect.  At the conclusion of the January 30, 2015 hearing, the Court rejected Mr. Zagula's view about the non-solicitation provision and entered the temporary restraining order forbidding ZK (and its agents) from soliciting plaintiff's producers.  In its findings and conclusions, the Court stated, among other things, that the plain language of the Agreement established that the non-solicitation clause had not yet expired.

At the hearing on plaintiff's preliminary injunction motion, defendants' counsel explained that Mr. Zagula and ZK, though they disagree with the Court's conclusions, have recognized that the Court rejects their pre-lawsuit position.  Defendants' counsel argues that Mr. Zagula has changed his behavior so that it complies with the Court's conclusions, including its determination that the non-solicitation clause is still in effect.  While Mr. Zagula did not appear

11

for the preliminary injunction hearing, his counsel represents that ZK has complied with the non-solicitation provision and that Mr. Zagula intends to abide by it going forward.  But Mr. Zagula, himself, has not submitted evidence, by affidavit or otherwise, confirming his intention to adhere to the Agreement as the Court has interpreted it.[3]  And because Mr. Zagula did not attend the preliminary injunction hearing on February 12, 2015, plaintiff had no opportunity to cross-examine him about the sincerity of his counsel's representations that Mr. Zagula is not currently breaching and does not intend to breach the Agreement in the future.  Nevertheless, defendants argue that plaintiff cannot establish irreparable harm here because no evidence exists showing that defendants have violated the non-solicitation clause since the Court issued the temporary restraining order.

Neither the parties nor the Court has identified any case law that illuminates the novel issue this circumstance presents—whether a plaintiff can establish irreparable harm after the defendant renounces any intent to engage in conduct prohibited by contract.  The Court has located one case, however, that is instructive even though it is not directly on point.  In *Giftango, LLC v. Rosenburg*, the District of Oregon found that the plaintiff had failed to make the requisite showing of irreparable harm where the individual defendants initiated a plan to violate confidentiality and non-solicitation clauses in their employment contracts with the plaintiff, but retreated from those plans after the plaintiff initiated litigation and obtained temporary injunctive relief.  925 F. Supp. 2d 1128, 1139, 1140 (D. Or. 2013).  In *Giftango*, the record showed that

---

[3]      Plaintiff has submitted an email that Mr. Zagula sent to certain producers on February 2, 2015, after the Court's entry of the temporary restraining order.  In that communication, Mr. Zagula rescinded the invitation to the San Diego event because the Court had "entered an order which restrains [ZK] from working with [the producers]."  (Doc. 28-1 at 1)  Mr. Zagula stated in that email that "for now, [he has] to live with [the Court's order]" and that he and his counsel are "still sorting out what exactly [the order] means [he] can and cannot do."  (*Id.*)  While this email shows that Mr. Zagula is taking steps to comply with the temporary restraining order, the Court does not agree that this email shows Mr. Zagula has disclaimed any intent to solicit plaintiff's producers in violation of the Agreement.

while the individual defendants may have initially posed a threat, they had not actually violated the contracts and they were not presently employed by a competing company. *Id.* at 1140. The court also concluded that plaintiff had presented no other evidence of irreparable harm. *Id.* Thus, the court ruled plaintiff had failed to show it would suffer substantial, irreparable harm absent injunctive relief. *Id.*

In contrast, here, the record shows that Mr. Zagula actually violated the non-solicitation clause by contacting plaintiff's producers and inviting them to an event in San Diego with the intent to solicit them. Thus, unlike the facts in *Giftango*, the facts here show a real violation of the Agreement. Moreover, as shown above, plaintiff has presented other evidence of irreparable harm in the form of loss of goodwill. This differs from the plaintiff's proof in *Giftango*, where plaintiff failed to show other evidence of irreparable harm. Thus, the Court finds *Giftango* distinguishable from the facts presented here.[4]

In addition, the Court is not convinced that counsel's representations about his clients' intentions to adhere to the terms of the Agreement demonstrate an absence of irreparable harm. The facts here establish an actual breach of the Agreement by Mr. Zagula. His conduct now may

---

[4]     The Court also recognizes that the Tenth Circuit has held, in the standing context, that a threat of injury to a plaintiff challenging a law is negated when the government renounces any intention to enforce that law. *See Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 904 n.1 (10th Cir. 2012) (citing *Winsness v. Yocom*, 433 F.3d 727, 729, 732 (10th Cir. 2006) (a political candidate who had defaced state and federal flags had no standing to challenge Utah flag-abuse statute where district attorney stated he had no intention of prosecuting candidate under the statute); *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004) (a Utah resident who had engaged in sodomy lacked standing to challenge sodomy law in light of the government's assurances of non-prosecution)). These cases are different than the facts presented here.

        In this case, ZK has conceded that it breached the Agreement, albeit under the belief that the non-solicitation clause was no longer in the effect. Thus, plaintiff has asserted an injury sufficient to establish standing, unlike the plaintiffs in the cases cited above. Moreover, even if the Court applied these standing cases to the facts here, the Supreme Court has noted that "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 190 (2000). Although defendants have announced their intention to honor the Agreement, the Court cannot find, based solely on defendants' counsel's representations, that it is "absolutely clear" that no wrongful conduct will recur.

comply with the Agreement, but the Court's temporary restraining order required him to do so. Under defendants' logic, a defendant could prevent a plaintiff from obtaining a preliminary injunction every time a court enters a temporary restraining order.  All the argument would require is a statement (by counsel) that defendant intends to continue his compliance even after the court dissolves the temporary restraining order.  In that scenario, a plaintiff will have difficulty proving a risk of substantial harm because, although defendant previously may have engaged in conduct violating the temporary restraining order, there is no current risk of harm if defendant announces (to his attorney) that he is complying with the terms of the temporary restraining order.  While the issue is interesting and the authority is scant, the Court concludes that it should not permit a previous contract violator to avoid injunctive relief simply by professing that he has complied with his court-ordered obligations and will continue to do so going forward.  Thus, the Court rejects defendants' argument that plaintiff has shown no risk of substantial harm based merely on counsel's representation that Mr. Zagula will adhere to the terms of the Agreement going forward.

In sum, the Court finds that the irreparable harm issue is a close and difficult one, but plaintiff has met its burden to support entry of a preliminary injunction enjoining ZK from violating the non-solicitation clause in the Agreement.

### B.  Balance of Harms

Plaintiff also has shown that the harm it will sustain without an injunction outweighs the harm to defendants if the Court issues the injunction.  Here, the harm to defendants is minimal. Defendant's counsel professes that his clients plan to conform their behavior even if not ordered to do so.  Also, the non-solicitation restrictions are temporary and limited in scope.  In contrast, the harm to plaintiff in the absence of a preliminary injunction is great.  Thus, on balance, the

hardship to defendants is significantly outweighed by the likely hardship plaintiff will suffer if the Court does not enjoin ZK from violating the Agreement's non-solicitation clause.  In addition, the bond amount established by this Order protects and compensates defendants for any harm produced by a later ruling that the injunction issued in error.

### C.  Public Interest

The enforcement of a valid contract is in the public interest.  *Uarco Inc. v. Eastland*, 584 F. Supp. 1259, 1262 (D. Kan. 1984).  The public also has an interest in restraining unfair competitive practices.  *Heatron, Inc. v. Shackleford*, 898 F. Supp. 1491, 1502 (D Kan. 1995) (citing *Olin Water Servs. v. Midland Research Labs.*, 596 F. Supp. 412, 415 (E.D. Ark.1984)). Therefore, the Court's issuance of a preliminary injunction here is not adverse to the public interest.

### D.  Likelihood of Success on the Merits

The Tenth Circuit applies a more lenient standard for the first factor (the likelihood of success on the merits) where, as here, the movant seeking a preliminary injunction establishes the other three factors.  *Prairie Band of Potawatomi Indians*, 253 F.3d at 1246 (citation omitted). In that situation, the movant need not show "a substantial likelihood of success" and instead "need only prove that there are questions going to the merits . . . so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."  *Id.* at 1246–47 (citation and internal quotation marks omitted).  Plaintiff has met its burden here of showing a probability of success on the merits.

### 1.  The Non-Solicitation Period Has Not Expired.

The non-solicitation clause states that it runs "[f]or a period beginning on the effective date of this Agreement and continuing for thirty (30) months after [plaintiff's] final payment to

ZK arising out of this Agreement . . . .”  Agreement at § 13(a) (Doc. 1-1 at 5).  Defendants argue that the non-solicitation period has expired, and therefore ZK has not breached the Agreement. Defendants assert that the term, “payment arising out of this agreement,” only includes payments to ZK for recruiting producers to plaintiff.  The only payment that defendants contend ZK received for such recruitment occurred on May 1, 2012.  Thus, defendants argue, the Agreement’s non-solicitation period expired thirty months after May 1, 2012, or on October 31, 2014.  But defendants’ reading of the contract contradicts the actual words the parties used to express their bargain.

The Agreement states that the non-solicitation period begins to run on the date of the “final payment to ZK *arising out of this agreement*.”  Agreement at § 13(a) (Doc. 1-1 at 5) (emphasis added).  The Agreement provides that plaintiff would compensate ZK for several things including:  (1) ZK’s transfer of the “Centurion Coaching” training program; (2) ZK’s efforts to recruit producers; and (3) ZK’s “personal production,” meaning ZK’s sale of insurance products that it placed through plaintiff.  *Id.* at § 3 (Doc. 1-1 at 2–3).  Plaintiff submitted evidence showing that it had paid ZK for personal production in November 2014.  Plaintiff contends that this payment for personal production is a “final payment to ZK arising out of this agreement,” and, therefore, the thirty-month non-solicitation period did not start running until November 2014 under the terms of the Agreement.  The Court finds this testimony persuasive. Based on this evidence and the plain language of the Agreement, plaintiff has demonstrated a probability that it will succeed on the merits of proving that the non-solicitation clause has not expired.

## 2.  The Non-Solicitation Clause Is Enforceable.

Defendants also argue that the non-solicitation clause is overly broad and therefore unenforceable.  Under Kansas law,[5] it is "well-established that a noncompetition clause is valid if it is ancillary to any lawful contract" but the restraint must be reasonable under the circumstances and not adverse to the public welfare.  *E. Distributing Co., Inc. v. Flynn*, 567 P.2d 1371, 1376 (Kan. 1977) (citations omitted).  The enforcement of such restraints promotes the parties' freedom to contract.  *Weber v. Tillman*, 259 Kan. 457, 462 (Kan. 1996).  Indeed, Kansas recognizes "'[t]he policy of the law in general is to permit mentally competent parties to arrange their own contracts and fashion their own remedies where no fraud or over-reaching is practiced.  Contracts freely arrived at and fairly made are favorites of the law."  *Belger Cartage Serv., Inc. v. Holland Constr. Co.*, 582 P.2d 1111, 1118 (Kan. 1978) (quoting *Kansas City Structural Steel Co. v. L. G. Barcus & Sons, Inc.*, 535 P.2d 419, 424 (Kan. 1975)).

Kansas courts also recognize the difference between restrictive covenants in employment contracts and "those ancillary to a sale or other transfer of a business, practice or property."  *H & R Block, Inc. v. Lovelace*, 493 P.2d 205, 211 (Kan. 1972).  When a distinction is made, courts are "less prone to enforce restrictive covenants between employer and employee than where the restriction is part of a contract for sale of a business in which good will may be a part of the property sold . . . ."  *Id.*  The Kansas courts also construe an employment contract more strictly in determining whether its restraint is reasonable.  *Id.*

Here, plaintiff argues that the more lenient standard applies to the reasonableness of the non-solicitation clause because the Agreement memorialized the sale of a business or property and not an employment contract.  Indeed, the Agreement includes a substantial payment for ZK's

---

[5]     The parties chose Kansas law to govern their promises to one another.  The Agreement provides that it "shall be construed and enforced in accordance with the laws of Kansas, without regard to its rules concerning conflict and choice of law."  Agreement at § 18 (Doc. 1-1 at 6).

17

sale of intellectual property to plaintiff, which supports plaintiff's argument that the Agreement manifests a sale of property.  Also, as plaintiff points out, the parties to the agreement are two limited liability companies, not an employer and an employee.  Based on the facts surrounding the Agreement, plaintiff has established a probability of success on its argument that the more lenient standard should apply to the reasonableness determination of the Agreement's non-solicitation clause.

Defendants argue that the length of the non-solicitation period, even under the more lenient standard, is unreasonable because it runs for five years.  Defendants base this argument on the premise that this five-year period began on the date of the intellectual property's sale (May 1, 2012) and ran for 30 months after the Agreement's termination in 2014.  Plaintiff correctly argues that this argument contradicts the Agreement's plain language.  The Agreement contains only a 30-month restriction, which began when plaintiff made its final payment to ZK under the Agreement.  Plaintiff points out that the Kansas courts, deciding cases arising from employment contracts (which are subject to stricter construction), have upheld restrictive covenants that prohibit competition during the term of the contract and for a reasonable period after the termination of the contract.  *See*, *e.g.*, *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1146, 1153–54 (D. Kan. 2007) (reducing the contract's restraint prohibiting competition during the period of employment and for five more years after employment ended to two years after the employment ended which was a reasonable period of time to restrain defendant); *Uarco Inc. v. Eastland*, 584 F. Supp. 1259, 1262 (D. Kan. 1984) (two year restriction measured from the time the employees left the company held reasonable).

Like the employment contracts in those cases, the Agreement at issue here prohibited ZK from competing during the term of the Agreement and for thirty months (two and one-half years)

18

after the Agreement ended.  The Court finds that the facts and circumstances of this case satisfy plaintiff's burden to show that there are serious, substantial and difficult questions which require more deliberate investigation.  *See Prairie Band of Potawatomi Indians*, 253 F.3d at 1246–47 (citation and internal quotation marks omitted).  Thus, the Court concludes plaintiff has demonstrated a probability of success in proving that the Agreement is enforceable.

### 3. Zagula Admitted to Conduct Proscribed by the Non-Solicitation Clause.

Finally, plaintiff also has established a probability that it will succeed on the merits of its breach of contract claim.  In his testimony at the January 30, 2015 hearing, Mr. Zagula, who is a principal and agent of ZK, conceded that he had begun soliciting and planned to continue soliciting plaintiff's producers.  He also testified that he invited producers to the event in San Diego to meet his business partner and "ultimately to recruit them."  Tr. of Motion Hearing, Vol. II at 126:6–127:6 (Doc. 34 at 59).  These actions fall squarely within the conduct proscribed by the Agreement's non-solicitation clause.  The Court recognizes that plaintiff took these actions on the belief that the non-solicitation provision no longer applied.  But, as explained above, plaintiff has demonstrated a probability that it prove that the non-solicitation clause has not expired, and, if that is true, Mr. Zagula's actions constitute a breach of the Agreement.  The Court finds that plaintiff has raised serious, substantial and difficult questions which require more deliberate investigation.  *See Prairie Band of Potawatomi Indians*, 253 F.3d at 1246–47 (citation and internal quotation marks omitted).  Thus, plaintiff has established a probability of success on the merits.

**IV.     Conclusion**

The Court concludes that plaintiff has established each of the four requirements for obtaining a preliminary injunction.  Therefore, the Court grants plaintiff's Motion for Preliminary Injunction.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the plaintiff's Motion for Preliminary Injunction (Doc. 4) is granted.

**IT IS FURTHER ORDERED THAT** defendant Zagula Kaye Consulting, LLC, and its officers, agents, and employees, are hereby restrained and enjoined, from a period from February 20, 2015 to and including November 30, 2016, or until such time as this case is tried on the merits and a final judgment entered, whichever occurs first, from:

> directly or indirectly contacting, soliciting, or recruiting any licensed insurance producer with the purpose or effect of inducing such licensed insurance producer to leave the Advisors Excel, LLC distribution hierarchy with any carrier.

**IT IS FURTHER ORDERED THAT** the $10,000 bond (*see* Doc. 26) posted by plaintiff shall remain in effect and apply while the preliminary injunction is in effect.

**IT IS SO ORDERED.**

**Dated this 20th day of February, 2015, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
